UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ENDOTACH LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:12-cv-01630-LJM-DKL |
| | ) | |
| COOK MEDICAL INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON CLAIM CONSTRUCTION

After consideration of the parties', Endotach LLC and Cook Medical Incorporated ("Cook"), briefs on the issue of claim construction of the two patents-in-suit, U.S. Patent No. 5,122,154 (the "'154 patent") and U.S. Patent No. 5,593,417 (the "'417 patent") (collectively, the "Rhodes patents"), on March 6, 2013, the Court held a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) (hereinafter, "*Markman II*").  During the hearing, Endotach and Cook presented argument and expert witnesses regarding the construction of two disputed terms in the patents-in-suit, "stent means" in the '154 patent; and "anchoring means" in the '417 patent.  The Court has considered the parties' arguments and construes the claims as set forth below.

## I.  CLAIM CONSTRUCTION STANDARDS

When construing the terms in the assert claims of the Rhodes patents, the Court must determine the meaning of the language used before it can ascertain the scope of the claims Plaintiff asserts are infringed.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (hereinafter, "*Markman I*").  In doing so, the Court's interpretive focus is not the subjective intent of the party employing a certain term, but

the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean.  *See Phillips v. AWH*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *Innova/Pure Water v. Safari Water Filtration*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  When the Court undertakes its duty to construe the claims, it first must look to the intrinsic evidence:  the asserted and unasserted claims, the specification, and the prosecution history.  *See Phillips*, 415 F.3d at 1314; *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1366 (Fed. Cir. 2001); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581 (Fed. Cir. 1996); *Markman I*, 52 F.3d at 979.  Most of the time, such evidence will provide sufficient information for construing the claims.  *See Vitronics*, 90 F.3d at 1583.

The patent claims should "particularly point out and distinctly clai[m] the subject matter which the applicant regards as his invention."  *Markman II*, 517 U.S. at 373 (citing 35 U.S.C. § 112).  During claim construction, the appropriate starting point for the Court's inquiry is always the words of both the asserted and unasserted claims.  *See Phillips*, 415 F.3d at 1314; *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999); *see also Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).  As the Federal Circuit has noted, "[c]ommon words, unless the context suggests otherwise, should be interpreted according to their ordinary meaning."  *Desper Prods., Inc. v. Qsound Labs., Inc.*, 157 F.3d 1325, 1336 (Fed. Cir. 1998) (citing *York Prods., Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996)).  *See also Phillips*, 415 F.3d at 1314 (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)).  Further, when there are several common meanings for a term, "the patent disclosure serves to point away from the improper meanings and toward the

proper meaning." *Renishaw*, 158 F.3d at 1250. *Accord Phillips*, 415 F.3d at 1315-17 (discussing the role of the specification in claim construction).

The correct claim construction is also the one that "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Renishaw*, 158 F.3d at 1250. *See also Phillips*, 415 F.3d at 1316. That description, or specification, serves an important purpose. In it, the patentee must provide a written description of the invention that would allow a person of ordinary skill in the art to make and use the invention. *See Phillips*, 415 F.3d at 1313-14; *Markman I*, 52 F.3d at 979. The applicable statute requires that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . ." 35 U.S.C. § ¶112, ¶ 1. *See also Phillips*, 415 F.3d at 1312, 1315; *Johnson Worldwide Assocs.v. Zebco Corp.*, 175 F.3d 985, 993 (Fed. Cir. 1999). Therefore, to discover the correct meaning of a disputed claim term, the Court must refer to the specification's description of the invention.

In addition, a patentee may be his or her own lexicographer and use terms in a manner different from their ordinary meaning. *See Phillips*, 415 F.3d at 1316; *Johnson Worldwide Assocs.*, 175 F.3d at 990; *Vitronics,* 90 F.3d at 1582. If the patentee chooses to do that, he or she must clearly state the special definition in the specification or file history of the patent. *See Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). The specification then serves as a dictionary when it defines terms, either expressly or by implication, that are used in the claims.

3

Although claims must be read in light of the specification, limitations from the specification may not be read into the claims.  *See Phillips*, 415 F.3d at 1323; *Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).  In particular, the Court should not limit the invention to the specific examples or preferred embodiment found in the specification.  *See Phillips*, 415 F.3d at 1323; *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986).  Therefore, the "repetition in the written description of a preferred aspect of a claim invention does not limit the scope of an invention that is described in the claims in different and broader terms."  *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998).  *See also Phillips*, 415 F.3d at 1323 (describing how to distinguish between a best mode disclosure and a limitation disclosure in a specification).

Interpreting the meaning of a claim term "'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'"  *Laitram*, 163 F.3d at 1348 (quoting *Intervet Am., Inc. v. Kee-Vet Lab., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) (further citation omitted by *Intervet* court)).  *See also Innova/Pure Water*, 381 F.3d at 1117.  An extraneous limitation is a limitation added "wholly apart from any need to interpret what the patentee meant by particular words and phrases in the claim."  *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993).  *See also Phillips*, 415 F.3d at 1323; *Renishaw*, 158 F.3d at 1249.  Although there is a fine line between reading a claim in light of the specification and reading a limitation from the specification into the claim, the Court must look cautiously to the specification for assistance in defining unclear terms.  *See Phillips*, 415 F.3d at 1323-24; *Innova/Pure Water*, 381 F.3d at 1117.

4

The third source of intrinsic evidence is the prosecution history of the patents-in-suit.  *See Phillips*, 415 F.3d at 1317; *Desper Prods.*, 156 F.3d at 1336-37; *Vitronics*, 90 F.3d at 1582.  In a patent's prosecution history, the Court will find a complete record of the proceedings before the PTO leading to issuance of the patent.  *See Vitronics*, 90 F.3d at 1582.  The prosecution history contains both express representations made by the patentee concerning the scope of the patent, as well as interpretations of claim terms that were disclaimed during the prosecution.  *See id.* at 1582-83; *see also Phillips*, 415 F.3d at 1317; *Ecolab*, 264 F.3d at 1368.  "The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Phillips*, 415 F.3d at 1317.

In some cases, it may be necessary for the Court to consult extrinsic evidence to aid it in construing the claim language.  *See id.*; *Vitronics*, 90 F.3d at 1584.  Extrinsic evidence is any evidence outside of the patent and prosecution history, "including expert and inventor testimony, dictionaries, and learned treatises."  *Markman I*, 52 F.3d at 980.  *See also Phillips*, 415 F.3d at 1317.  It may be used to assist the Court's understanding of the patent or the field of technology.  *See Markman I*, 52 F.3d at 980-81.  However, "courts [should] not *rely* on extrinsic evidence in claim construction to contradict the meaning of claims discernible from thoughtful examination of the claims, the written description, and the prosecution history—the intrinsic evidence."  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (emphasis in original) (citing *Vitronics*, 90 F.3d at 1583).  Judges are not usually "conversant in the

particular technical art involved," or capable of reading the patent specification and claims as one skilled in the art might.  *See Markman I*, 52 F.3d at 986; *see also Pitney Bowes*, 182 F.3d at 1308-09.   Therefore, "consultation of extrinsic evidence is particularly appropriate to ensure that [the Court's] understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art."  *Pitney Bowes*, 182 F.3d at 1309.  *See also Phillips*, 415 F.3d at 1318.  When the Court relies on extrinsic evidence to assist with claim construction, and the claim is susceptible to both a broader and a narrower meaning, the narrower meaning should be chosen if it is the only one clearly supported by the intrinsic evidence.  *See Digital Biometrics v. Identix*, 149 F.3d 1335, 1344 (Fed. Cir. 1998); *see also Phillips*, 415 F.3d at 1317-19 (discussing the proper use of extrinsic evidence).  It is entirely proper for the Court to accept and admit extrinsic evidence, such as an expert's testimony, to educate itself but then base its construction solely on the intrinsic evidence.  *See Mantech Envt'l Corp. v. Hudson Envt'l Servs., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998).

Further, the Federal Circuit has taken special note of the use by courts of dictionaries.  In its *Vitronics* opinion, the court explained that although technical treatises and dictionaries are extrinsic evidence, judges are free to consult these resources at any time in order to get a better understanding of the underlying technologies.  90 F.3d at 1584 n.6.  The *Vitronics* court stated that judges may rely on dictionaries when construing claim terms as long as the dictionary definition does not contradict the definition found in, or ascertained by, a reading of the patent.  *Id.*  The Federal Circuit affirmed this approach in *Phillips*. 415 F.3d at 1322-23.

In the instant case, the parties dispute whether the terms "stent means" in the

'154 patent and "anchoring means" in the '417 patent must be construed according to 35 U.S.C. § 112, ¶ 6.   "Use of the word 'means' in claim language creates a presumption that § 112 ¶ 6 applies."  *Trimed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008) (citing *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996)).   However, the presumption may be overcome either if the element recites no function corresponding to the means, *see Rodine PLC v. Seaget Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999), or if "the claim recites sufficient structure for performing the described functions in their entirety."   *Trimed*, 514 F.3d at 1259. "Sufficient structure exists when the claim language specifies the exact structure that performs the function in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure."  *Id.* at 1259-60 (citing *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1376 (Fed. Cir. 2003); *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1365 (Fed. Cir. 2000)).

In cases where the Court determines that § 112, ¶ 6 applies, the Court uses special rules of construction.  *See, e.g., Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998) (describing the rules of construction for patent claim elements written in means-plus-function format).   Specifically, the "means" term "is essentially a generic reference for the corresponding structure disclosed in the specification."  *Chiuminatta Concrete Concepts v. Cardinal Indus.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998).  By using this format, a patentee is allowed to claim a function without expressing all of the possible means of accomplishing that function.  *See O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997).  "The price that must be paid for use of that convenience is limitation of the claim to the means [or acts] specified in the

written description and equivalents thereof."  *Id.*

Thus, a claim expressed in means-plus-function language constitutes an exception to the rule that prohibits reading limitations from the specification into the claims.  *See Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042 (Fed. Cir. 1993).  When dealing with a means-plus-function claim, specific alternative structures to accomplish the function mentioned in the specifications, and equivalents thereto, delineate the scope of the patent claim.  *See Mas-Hamilton Group*, 156 F.3d at 1211; *Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997).  The alternative structures must be specifically identified, not just mentioned as possibilities, in order to be included in the patent claim's scope.  *See Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1551 (Fed. Cir.), *cert. denied*, 522 U.S. 908 (1997).

## II.  <u>THE PATENTED TECHNOLOGY</u>

Endotach is the exclusive licensee of the Rhodes patents and has the right to enforce the Rhodes patents against all infringers.  Dkt. No. 1, ¶ 11. The Rhodes patents are directed to intraluminal and endovascular grafts for placement within a blood vessel, duct or lumen to hold it open.  '154 patent, Abstract; '417 patent, Abstract.  The grafts are composed of a flexible, tubular member or sleeve with multiple stents mounted on the periphery of the tube.  *Id.*  Both the '154 and the '417 patents issued in the 1990s. '154 patent, Date of Patent: June 16, 1992; '417 patent, Date of Patent, Jan. 14, 1997.

### A.  THE '154 PATENT

In the '154 patent, the sleeve and stents are expandable such that the inner cross-sectional area of the sleeve is increased.  '154 patent, Abstract.  Once expanded, "the stents[, whether internal or external to the sleeve,] are resistant to contraction back

to the compact state." *Id.*  The graft in the '154 patented invention is able to bend along its longitudinal axis to accommodate curved vessels, ducts or lumens.  *Id.*  The '154 patented invention claimed to overcome the problems associated with prior art intraluminal endovascular grafts such as chronic and/or acute restenosis; lack of effective control over the final expanded configuration of the graft; and relative rigidity, which prevents use in longer, curved vessels.  *Id.* col.2, l.11 to col.3, l.52.

Although the '154 patent has thirty-one (31) claims (some of which are method claims), Endotach is asserting only independent claims 1, 14 and 15 against Cook.  *Id.* col 9, l.28 to col.14, l.18; Dkt. No. 81, at 2.  The asserted claims read:

> 1.  An intraluminal graft of introduction within a portion of a blood vessel, duct or lumen of a living being, said graft comprising a sleeve and at least two stent means mounted thereon, said sleeve being an elongated member of a generally tubular shape having a longitudinal axis and formed of a first, relatively flexible, material, said material being impervious to the ingrowth of tissue therein, each of said stent means being generally ring-like in shape, [s]aid stent means being mounted about the periphery of a surface of said sleeve at selected points therealong to form (a) [sic] respective first sleeve sections, each of said first sleeve sections extending for respective portions of the length of said sleeve and being spaced from each other, said sleeve additionally comprising at least one second section, said second section being interposed between said at least two first sections, each of said stent means being arranged to be expanded from a compact state to an expanded states as said sleeve is so expanded so that the cross-section area of the interior of said sleeve is enlarged, said stent means when is said expanded state being resistant to contraction back to said compact state to thereby hold said sleeve in said compact state to thereby hold said sleeve in said expanded stated, said graft being able to bend longitudinally with respect to said axis to enable said graft to be readily accommodated within a curved blood vessel, duct or lumen.

> * * *

> 14.  An intraluminal graft for introduction within a portion of a blood vessel, duct or lumen of a living being, said graft comprising a sleeve and stent means mounted thereon, said sleeve being an elongated member of a generally tubular shape having a longitudinal axis and formed of a first,

9

relatively flexible, material, said material being impervious to the ingrowth of tissue therein, said sleeve comprising an outer peripheral surface, said stent means being generally ring-like in shape and mounted on said outer peripheral surface of said sleeve to form a first sleeve section, said stent means being arranged to be expanded from a compact state to an expanded state as said sleeve is so expanded so that the cross-sectional area of the interior of said sleeve is enlarged, said stent means when in said expanded state being resistant to contraction back to said compact state to thereby hold said sleeve in said expanded state, said graft being able to bend longitudinally with respect to said axis to enable said graft to be readily accommodated within a curved blood vessel, duct or lumen.

15.   An intraluminal graft for introduction within a portion of a blood vessel, duct or lumen of a living being, said graft comprising a sleeve and stent means mounted thereon, said sleeve being an elongated member of a generally tubular shape having a longitudinal axis, an outer peripheral surface, and being formed of a first, relatively flexible, material, said material being impervious to the ingrowth of tissue therein, said stent means being generally ring-like in shape and mounted on said outer peripheral surface of said sleeve to form a first sleeve section, said first sleeve section extending for only a portion of the length of said sleeve to form a first sleeve section, said first sleeve section extending for only a portion of the length of said sleeve, said sleeve additionally comprising a second sleeve section contiguous with said first sleeve section, said stent means being arranged to be expanded from a compact state to an expanded state as said sleeve is so expanded so that the cross-sectional are of the interior of said sleeve is enlarged, said stent means when in said expanded state being resistant to contraction back to said compact state to thereby hold said sleeve in said expanded state, said first and second sleeve sections being able to bend longitudinally with respect to said axis to enable said graft to be readily accommodated within a curved blood vessel, duct or lumen.

*Id.* col.9, l.28 to col.10, l.67.

The parties have stipulated to the meaning of two terms in the '154 patent:  "first sleeve section[s]" means "section[s] of sleeve where the [stent means or stent] is/are located;" and "second sleeve section[s]" means "section[s] of sleeve where the [stent means or stent] is/are not located."  Dkt. No. 87, at 1.  The disputed terms of the '154 patent include:  "stent means" and "when in said expanded state being resistant to contraction back to said compacted state to thereby hold said sleeve in said expanded

10

state." *Id.* at 2.

## B.  THE '417 PATENT

In the '417 patent, the stents are mounted on the outer surface of the sleeve. '417 patent, Abstract.  The stents have "anchoring projections" that "are preferentially oriented to include portions extending at an acute angle to the direction of the fluid flow to tightly engage the interior of the wall of the vessel, duct, or lumen under the force applied by the fluid flowing through the device." *Id.*

The '417 patent has fifteen (15) device claims.  '417 patent, col.9, l.23 to col.10, l.45.  Endotach is asserting claims 1, 2 and 13 of the '417 patent against Cook.  Dkt. No. 81, at 7.  The asserted claims of the '417 patent read:

> 1.  An intraluminal medical device for securement within a vessel, duct, or lumen of a living being, the vessel, duct, or lumen having an interior surface, said device comprising a tubular member and anchoring means, said tubular member having a passageway extending therethrough and an outer periphery, said tubular member being arranged to have a body fluid flow through said passageway in a first direction when said device is located within the vessel, duct, or lumen, whereupon a force is applied to said tubular-member, said anchoring means being located adjacent said outer periphery of said tubular member and comprising plural projections arranged for engagement with the interior surface of the vessel, duct, or lumen, each of said projections having a leading portion located in the upstream direction of the fluid flow and a trailing portion located in the downstream direction thereof, said trailing portion including at least one surface preferentially oriented to extend at an acute angle to the first direction, whereupon the force applied to said tubular member by the fluid flowing through said passageway produces on each of said projections a force component to cause said at least one surface to tightly engage the interior surface of the vessel, duct, or lumen to fixedly secure said device in place.

> 2.  The device of claim 1 wherein said at least one surface is inclined upward in the first direction.

> * * *

> 9.  The device of claim 1 wherein said tubular member is a stent.

10.  The device of claim 9 wherein said stent is expandable from a contracted state to an expanded state, said anchoring means engaging the interior surface of the vessel, duct, or lumen when said stent is in said expanded state to secure said device in place.

* * *

13.  The device of claim 10 wherein said device is an endovascular graft, said endovascular graft additionally comprising a graft sleeve, said sleeve being coupled to said stent and having an outer surface and inner passageway through which the body fluid flows in the first direction to apply the force to said projections.

*Id.* col.9, l.23 to col.10, l.40.

The parties have stipulated to the meaning of two terms in the '417 patent: "first direction" means "direction of fluid flow;" and "preferentially oriented" means "positioned." Dkt. No. 87, at 1.  The parties dispute the meaning of the following terms: "tubular member;" "anchoring means;" "projections;" "engagement with" or "engaging;" "to tightly engage the interior surface of the vessel, duct or lumen to fixedly secure said device in place;" "a leading portion;" "a trailing portion;" "at least one surface;" and "stent."  Dkt. No. 87, at 2-3.

### III.  <u>CONSTRUCTION OF THE DISPUTED TERMS OF THE '154 PATENT</u>

#### A.  STENT MEANS

The parties dispute whether the Court should interpret the term "stent means" according to § 112, ¶ 6.  The use of the word "means" creates a presumption that § 112, ¶ 6 applies, but the presumption can be rebutted if either (1) the claim element recites no function corresponding to the means; or (2) "even if the element specifies a function, [] it also recites sufficient structure or material for performing that function."  *Rodine*, 174 F.3d at 1302.  Endotach argues that the term "stent" had a well understood structure in

the art at the time of the invention and that "the claim language includes sufficient structure to perform the recited function."   Dkt. No. 82, at 9.   Specifically, a "stent" is a tubular structure used to support a blood vessel.   *Id.* at 11.   Endotach asserts that "stent means" and "stent" are used interchangeably in the specification to describe the part that holds the graft open, which implies that the terms mean the same thing.   *Id.* at 12. Further, the lack of a more precise structure does not render the term indefinite because the term "stent" implies a broad class of structures well known in the art.   Even if the Court decides that the strictures of § 112, ¶ 6 should apply to the term, Endotach avers that the term should be broadly construed to be any "ring-shaped or tubular shaped stent."   *Id.* at 14-15.

Cook asserts that the § 112, ¶ 6 presumption should apply.   Dkt. No. 92, at 18-20.   Specifically, Cook argues that the function is to hold the sleeve in an expanded state.   *Id.* at 18.   Further, there is insufficient recitation of the structure in the claims to perform this function; therefore, the "stent means" is limited to the structures identified in the specification, which are deformable, non-resilient ring-like members 30 or 40.   Dkt. No. 19-21.   Cook states that the term "stent means" is too generic to overcome the presumption that it is a means-plus-function term.   Dkt. No. 93, at 6.   Cook also contends that, even if the Court decides that the "stent means" is not amenable to interpretation under § 112, ¶ 6, the term should be limited to exclude self-expanding stents because the patent disparages such devices.   Dkt. No. 92, at 21-23.

The Court concludes that the strictures of § 112, ¶ 6 do not apply to the term "stent means" because the term "stent" had a well-known structure in the art at the time of the invention and that structure combined with the additional structure set forth in the

claims is sufficient to perform the recited function.  The parties presented the testimony of experts on the subject of whether there was enough structure in the claims to perform the function.  *See, generally*, Dkt. No. 96, Hr'g Tr.  The Court does not find it necessary to resort to their opinions with respect to the legal issue of the application of § 112, ¶ 6.  However, the Court found it instructive that both experts testified that a "stent" had an ordinary meaning to one skilled in the art at the time of the invention; and referred to a broad class of hollow or tube-like structures that hold something open or provided support.  Hr'g Tr. at 20-21 (Silver-Direct); 90 (McLean-Cross).  *See also*, STEDMAN'S MEDICAL DICTIONARY, at 1674 (Williams & Wilkins, 26th Ed. 1995) (defining "stent" as "[s]lender thread, rod, or catheter, lying within the lumen of tubular structures, used to provide support during or after their anastomosis, or to assure patency of an intact but contracted lumen") (hereinafter, "STEDMAN'S'")).  Further, the term, broadly construed, covered both self-expanding stents and stents that required a secondary tool, such as a balloon, to cause them to expand.  Hr'g Tr. at 22 (Silver-Direct); 89-90 & 92 (McLean-Cross).

Starting with the claim language, each independent device claim uses a "stent means" to perform the function of holding open the graft sleeve.  '417 patent, col.9, ll.31, 35-40, 44-50; col.10, ll.25, 31-39; *id.* ll.45, 50-63.  Further, the structure recited in the independent claims, other than the use of the word "stent" itself, is the "generally ring-like [] shape."  *Id.* col.9, ll.35-36; *id.* col.10, ll. 31, 51.  However, the claims also suggest a material or mechanical requirement that allows the stent means to perform its function.  The claims require that the stent means be "resistant to contraction back to [a]

compact state" once it has been expanded.  *Id.* col.9, ll.47-49; *id.* col.10, ll.37-49 & ll.60-62.

Cook asserts that this element merely recites what the stent means does, not the structure that performs the recited function.  But, Cook misses the connection between the class of objects that were known to those skilled in the art and the requirements set forth here that they are ring-like and resistant to contraction once expanded.  These requirements narrow the structure of the class of devices known as stents.  Further, Cook itself acknowledges that the correct interpretation of stent means has a special structural property, regardless of whether or not § 112, ¶ 6 applies, because it advocates that any stent means be "deformable" and "non-resilient."  Dkt. Nos. 92, at 18-23; 93, at 2-10.  As the Federal Circuit has stated, if the claim recites enough structure or materials for performing the stated function, then the presumption that § 112, ¶ 6 applies is overcome.  *Rodine*, 174 F.3d at 130.  Combined with the knowledge of one skilled in the art at the time of the invention as to the plain meaning of stent (a hollow support), according to the claims of the '417 patent, a "stent means" is a generally ring-like, hollow support that is resistant to contraction back to a compact state once it has been expanded.  These structural and material requirements are sufficient to perform the stated function of holding open the sleeve.

Further, there is ample evidence in the specification that a "stent means" was used with the ordinary meaning of "stent" and that the term does not need interpretation pursuant to § 112, ¶ 6.  The term "stent means" is used once in the specification in reference to the method claims and without regard to any structure.  '154 patent, col.4, ll.43-46 (stating that "the means for expanding the stent is operated . . . to cause the

stent means to expand to the expanded state").  The only other place the words "stent" and "means" are even close to each other in the specification is in the description of the preferred embodiment where it states, "The spaced stent members **30** serve as a means for holding or retaining the tube **28** in any desired expanded state . . . ."  *Id.* col.6, ll.28-30.   Otherwise, the term "stent" is used alone or in conjunction with "member" with respect to any descriptions of the patented device.  Abstract; col.4, ll.15-16; *id.* ll.19-20; *id.* l.23; *id.* l.26; col.5, l.64; col.6, l.28; *id.* l.32; *id.* l.59; *id.* l.65.; col.7, l.1; *id.* l.10; *id.* l.20; *id.* l.39-40 ("the use of the expansion holding stents"); *id.* l.45 ("supporting stents"); *id.* l.51.

Moreover, the more generic recitations of the invention in the Abstract and Summary of the Invention sections refer to a "stent" in the most basic sense, while reiterating that it has a specific characteristic – it is resistant to contraction back.  Abstract; col.4, ll.15-16; *id.* ll.19-20; *id.* l.23; *id.* l.26.  This generic use of the term "stent" to refer to a class of objections supports the Court's conclusion that "stent means" has its ordinary meaning in conjunction with the specific characteristics identified in the claims.  *Accord Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1347 (Fed. Cir. 2002) (stating that "[a] claim term recites sufficient structure if 'the "term, as the name for structure, has a reasonably well understood meaning in the art"'" (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880-81 (Fed. Cir. 2000) (quoting *Greenburg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996)))); *Optimal Recreation Solutions LLP v. Leading Edge Techs., Inc.*, 6 Fed. Appx. 873, 878 (Fed. Cir. 2001) (stating that the fact that particular terms have broad meanings did "not detract from

their well understood meanings as the name for structure" and concluding that § 112, ¶ 6 did not apply).

Finally, the Court disagrees with Cook that Rhodes' recitation of the disadvantages of prior art stents forecloses application of the plain meaning to the term "stent means" in the claims of the '154 patent.  Rhodes did not clearly disavow the use of any particular stent because in the section discussing prior art, he refers to stents of all kinds, including ones with links that appear to have a very similar structure to those described by the preferred embodiment.  *See* '154 patent, col.2, l.31 to col.3, l.2 (discussing, *inter alia*, coiled spring stents, zig-zag stainless steel stents and heat sensitive material stents).  If the Court applies Cook's rule of construction then, it would preclude the preferred embodiment.  A construction that would exclude the preferred embodiment is rarely correct.  *See SanDisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) (citing *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858 (Fed. Cir. 2004); *Vitronics*, 90 F.3d at 1583).  In addition, as Cook's own expert admitted, the prior art referenced by Rhodes included both self-expanding and balloon expanding stents.  Hr'g Tr. at 91-92; '154 patent, col.3, ll.3-46 (listing prior art examples of stents).  Again, to conclude that Rhodes disavowed all prior art stents would exclude his preferred embodiment, a type of balloon-expanding stent, which is improper.  Neither will the Court, without some clear disavowal, limit the construction of a term to the preferred embodiment based on its differences from the accused device, which appears to be what Cook is advocating.

Moreover, the patent claims put limits on the breadth of the term by requiring that the patented stents be ring-like and "resistant to contraction back to a compact state."

17

The plain meaning of the term stent, in combination with this material and/or mechanical requirement, limit the invention to that subset of stents that have the requisite structural properties.  Whether those properties are obtained through the choice of material; or the design of the hollow, ring-like part; or a combination of the two, as disclosed in the description of the preferred embodiment; the invention does not preclude the use of a self-expanding stent.

For these reasons, the Court concludes that "stent means" is not subject to interpretation under § 112, ¶ 6, and means "a generally ring-like, hollow support that is resistant to contraction back to a compact state once it has been expanded."

## B.  WHEN IN SAID EXPANDED STATE BEING RESISTANT TO CONTRACTION BACK TO SAID COMPACTED STATE TO THEREBY HOLD SAID SLEEVE IN SAID EXPANDED STATED

Cook asserts that the phrase "when in said expanded state being resistant to contraction back to said compacted state to thereby hold said sleeve in said expanded state" precludes movement back from the expanded position.  Dkt. Nos. 92, at 23-24 (citing, *inter alia*, '154 patent, col.6, ll.32-64); 93, at 11.  Cook argues that to hold the sleeve in "said expanded state" "[a]nything short of 'preclusion' would not serve" the stated function.  Dkt. No. 93, at 11.  Cook also contends that this term requires additional limitations regarding the extent of the expanded position – partial or full – such that the term means "once moved to an expanded position (partial or full), movement back from that expanded position to the compact state is precluded."  Dkt. No. 92, at 23-24.

Endotach disagrees and states that the plain and ordinary meaning of the phrase should apply.  Dkt. No. 82, at 15.  Further, Endotach argues that "resistant" means

capable of or exhibiting an opposing or retarding force, which is less restrictive than "precluded," which means to make impossible. *Id.* at 15-16. Endotach acknowledges the description of the preferred embodiment, which discusses preclusion from returning to a compact state, but points to multiple other references about the invention in the specification that merely require "resistance" in support of its plain meaning construction. *Id. See also* Dkt. No. 85, at 9-10.

It appears to the Court that the parties are really arguing about the extent to which the stent means must resist contraction back to the compact state to perform the function of holding open the sleeve. Endotach's definition merely requires opposition of a force, which is one plain meaning definition of the term "resistant," but provides little guidance as to the extent of any resistant characteristic. Cook's definition precludes any movement of the stent after it has been expanded, which imparts the maximum extent of resistance and imports a limitation from the preferred embodiment into the claims. The Court concludes that the requisite extent of resistance is less than preclusion but more than mere opposition.

As discussed at some length in the previous section regarding construction of the term "stent means," the '154 patent claims describe an intraluminal graft device that is comprised of a sleeve and stents, where the stents are hollow, ring-like supports that resist contraction back to a compact state. '154 patent, col.9, l.28 to col.10, l.66. The Court has concluded that the "resistant to contraction back" element is a structural, material and/or mechanical requirement for the stent; therefore, the Court agrees with Cook that further construction of this characteristic would be helpful. Starting with the plain meaning of the term "resistant" with respect to its use in the claims to describe the

ability of the stent to hold the sleeve open, something more than an ability to oppose a force is implied.  Rather, the stent must be able to withstand or hold off the force trying to close the sleeve once it has been expanded.  The common definition of resist to mean "to withstand the force or effect of" best fits the characteristic described by the claims of the '154 patent for "resistant to contraction back."  *See* WEBSTER'S THIRD NEW INT'L DICTIONARY, UNABRIDGED 1932 (1981) (defining "resist" as "**1:** to withstand the force or the effect of;" and "resistant" as "making or having powers of resistance: RESISTING") (hereinafter, "WEBSTER'S").

The importance of this concept of withstanding the force of contraction back is inherent in the plain reading of the claims and the lessons in the specification.  Rhodes describes that one of the problems with prior art stents, including stents formed of links in a zig-zag shape (which is the shape of a preferred embodiment), "is there is no effective control over the final expanded configuration of each structure."  '154 patent, col.2, ll.31-38.  It is clear that to overcome this disadvantage of the prior art, Rhodes repeatedly emphasizes in the asserted and unasserted claims as well as the specification that the purpose for the stents' resistance to contraction back is to hold the sleeve in its expanded state.  *Id.* col.9, ll.47-50 (stating in claim 1: "said stent means when in said expanded state being resistant to contraction back to said compact state to thereby hold said sleeve in said expanded state"); *id.* col.10, ll.37-39 (stating the same in claim 14); *id.* col.10, ll.60-63 (stating the same in claim 15); *id.* col.11, ll.28-21 (stating the same in claim 16); *id.* col.11, ll.60-63 (stating the same in claim 22); *id.* col.12, ll.32-34 (stating the same in claim 25); *id.* col.13, ll.7-9 (stating the same in claim 28); *id.* col.4, ll.26-28 (stating in the Summary of the Invention that the "stent is resistant to

contraction back to the compact state to thereby hold the sleeve in the expanded state"); *id.* col.6, ll.28-32 (stating that the "stent members **30** serve as a means for holding or retaining the tube **28** in any desired expanded state (i.e., from a slightly partially expanded state, not shown, to the fully expanded state like shown in FIG. **5**)"); *id.* col.6, ll.65-66 (stating that "the stents of this invention serve to hold the tube member **28** in an expanded state"); *id.* col.7, l.68 to col.8, l.5 (describing the stent of the preferred method being "resistant to permitting the links to pivot back toward each other, [which] holds the portion of the graft which has been expanded in that expanded state"); *id.* col.9, ll.7-12 ("The stenting function provided by the spaced stents **30** or **40** reinforces the body passageway producing a lumen, which, though flexible, is not collapsible.   In particular, the wall of the graft is supported about its length by the various spaced stents … to maintain internal lumen diameter.").   It was for this very reason that the Court concluded that this element was a necessary material and/or mechanical feature of the properly construed stent means:  it is a critical characteristic of the claimed invention.  In order to "hold open" the sleeve, the stent must successfully oppose any "contraction back" force, which connotes an ability to withstand those forces.

The Court cannot, however, agree with Cook that the correct construction precludes movement back.  Preclusion connotes an impossibility, which goes farther than the concept of resistance as set forth in the claims because it implies rigidity.  The claims and the specification teach that the stent prevents collapse of the sleeve, or contraction back of the sleeve, but the intraluminal graft of the patented invention is not intended to be rigid.  *See id.* col.3, ll.58-60 (describing one object of the invention is "to

provide an expandable intraluminal vascular bypass graft which is [] flexible"); *id.* col.4, ll.26-28 (describing in general terms resistance to contraction back to the compact state); *id.* col.6, l.49 (describing the material for the preferred embodiment as "deformable, but not resilient"); *id.* col.9, ll.7-9 (stating that "the spaced stents **30** or **40** reinforces the body passageway producing a lumen, which, though flexible, is not collapsible").   The description of the preferred embodiment does reference that the joints thereof "are arranged to maintain any angular orientation between the connected links from the compact state to the maximum expanded state such that once the stents **30** are moved to any expanded position (whether partial or full) movement back to the compacted state is precluded."   *Id.* col.6, ll.57-64.   However, the claims are not written with this restrictive language and the Court will not import a limitation of the preferred embodiment into the claims.   *Accord SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005) (stating that "it is axiomatic that without more the court will not limit claim terms to a preferred embodiment described in the specification") (citing *Laitram*, 863 F.2d at 865).

For these reasons, the Court concludes that the stent means is "resistant to contraction back" if it "is able to withstand the force or effect of" contraction back.

### IV.  CONSTRUCTION OF THE DISPUTED TERMS OF THE '417 PATENT

#### A.  TUBULAR MEMBER

The first term with a disputed definition in the '417 patent is "tubular member." Endotach argues that the term is readily understood and needs no construction, but if a definition is necessary, the term means "a device that has the form of a tube."   In contrast, Cook asserts that a "tubular member" must be limited to "tubular graft sleeve"

22

because the specification uses the terms interchangeably and a broader definition for the term is ruled out by the distinction in the specification between a tubular member and a stent.  Dkt. No. 92, at 25.  Moreover, Cook contends that because a "stent" as a "tubular member" has no support in the specification, Claim 9 is invalid.  *Id.* at 25 n.14 (citing *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004)).

The Court concludes that "tubular member" is sufficiently clear that no further definition is required.  Cook's construction unnecessarily imports a limitation from the specification into the claims.  Starting with the claim language itself, the intraluminal device is described as a structure that has a passageway through which fluid will flow and an outer periphery to which an anchoring means is attached and/or located.  '417 patent, col.9, ll.23-33.  In other words, the "tubular member" is a structure in the form of a tube; to define it as such merely repeats what the patentee said with more words and is not helpful.

Claim 9 supports the broadest construction – the plain meaning – because claim 9 recites all the limitations of Claim 1, but specifies that the tubular member be a stent.  *Id.* col.10, ll.22-23.  Therefore, the patentee intended for a stent to comprise the entirety of the intraluminal device, with the anchoring means secured thereupon.  Such a claim would be invalid if the Court were to import from the specification a definition for "tubular member" of "tubular graft sleeve," since this has a distinct meaning separate and apart from "stent."  The Court will not unnecessarily import limitations from the specification into the claims nor will it exclude embodiments disclosed in the specification, particularly when doing so would invalidate another claim.  *See Phillips*, 415 F.3d 1303, 1323 (discussing "the distinction between using the specification to determine the meaning of

23

a claim and importing limitations from the specification into the claim"); *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) (stating that it is extraordinary to "interpret claim terms in a way that excludes embodiments disclosed in the specification" unless there is a clear disclaimer in the specification).

The Court finds no reason to limit the "tubular member" in Claim 1 to a "tubular graft sleeve."  Although the entirety of the Abstract discusses the intraluminal device as one with a tubular graft sleeve and a series of stents, the Background of the Invention section speaks mainly to problems associated with balloon intraluminal dilation and tubular prosthetic grafts or stents.  '417 patent, col.1, l.1 to col.2., l.63.  The same section offers the invention described by the '154 patent as an example of an improvement over these prior art methods and devices.  *Id.* col.2, l.64 to col.3, l.37.  The Background section specifically points out that improvements in the anchoring means used for grafts of any kind are needed.  *Id.* col.3, ll.35-37.  Taken as broadly as it is written, the Court views this background to apply to all devices used to intraluminally hold open a vessel, duct, or lumen, which in its early form was a stent – or tubular member – that is not a tubular graft sleeve.

The Objects of the Invention section further supports a broad reading for the term tubular member.  It teaches that "a further object of th[e] invention [is] to provide anchoring means for intraluminal medical devices, e.g. endovascular grafts, stents, etc[.], arranged to be fixedly secured within a vessel, duct, or lumen of a living being."  This statement confirms that the inventor intended for "tubular member" to have its broadest meaning – its plain meaning – because it references not only grafts (which would have a tubular graft sleeve), but stents alone.  The stent alone is exactly the

24

invention described in Claim 9.  Moreover, the "etc." in this statement also makes clear that the inventor contemplated other intraluminal medical devices not listed.

Similarly, the Summary of the Invention section sets forth in basic terms the components of the medical device the '417 patent claims cover:

> a tubular member and anchoring means.  The tubular member has a passageway extending therethrough and outer periphery, and is arranged to have fluid flow through its passageway in a first direction when the device is located in the vessel, duct, or lumen, whereupon a force is applied to the tubular member.  The anchoring means are located adjacent to the outer periphery of the tubular member . . . .

*Id.* col.4, ll.1-9.  Here, the tubular member is described in its broadest terms as a tube-shaped part; it is not necessary that it be a "tubular graft sleeve."  Again, this section contemplates that the tubular member could be a stent upon which the anchoring means is located on the periphery.  Further, it is not until the description of the preferred embodiment that the inventor even mentions a graft sleeve, and then the tubular member also includes a plurality of ring-like stents disposed about the periphery.  *Id.* ll.26-29.  In this construction, limiting the "tubular member" in Claim 1 to a "tubular graft sleeve" would exclude the preferred embodiment, which is improper, particularly where, as here, a broader interpretation is supported by the claim language and the specification.  *See Oatey*, 514 F.3d at 1276.  Cook has provided no evidence that Rhodes intended to disclaim medical devices were a tubular member was something other than a tubular graft sleeve.

For these reasons, the Court concludes that "tubular member" needs no further construction because its plain meaning is sufficiently descriptive.

## B.  ANCHORING MEANS & RELATED TERMS

Endotach contends that the term "anchoring means" is not a means-plus-function

term and should be construed in accordance with its ordinary meaning as used in the claims and the specification.  Specifically, Endotach asserts that the term is not written in classic "means-plus-function" terminology and the claims themselves recite enough structure to perform any recited function to one of ordinary skill in the art at the time of the invention.  Endotach's expert testified to this as well.  Endotach avers that an "anchoring means" is "a plurality of protuberances or projections to aid in securing the device in place within the vessel, duct, or lumen."

In contrast, Cook argues that Rhodes' use of the word "means" automatically triggers the presumption that "anchoring means" should be construed as a means-plus-function term in accordance with § 112, ¶ 6.  Further, Cook contends that the function performed by the anchoring means is "to tightly engage the interior surface of the vessel, duct, or lumen to fixedly secure said device in place."  Cook asserts that the corresponding structures in the specification are the "plural protuberances 40," which are pictured in Figure 3 and are arrow-shaped; or the alternative "projections [that] are of a general 'wedge' shape and [are] designated by the reference number 70," which are pictured Figure 8.   Dkt. No. 92, at 27-28 (quoting '417 patent, col.7, ll.9-13, col.7, ll.17-22, ll.30-38 & ll.55-59 & Fig. 3 & col.8, ll.46-50 & Figure 8).  Cook's expert testified that the claims do not provide enough structure to perform the recited function.  Additionally, Cook argues that, even if the "anchoring means" is not a means-plus-function term, its construction should be limited to the two alternative embodiments described in the specification because, during prosecution of the patent, Rhodes specifically disavowed prior art projections with shapes such as domes, hooks, barbs, tine-line members with sharp points, protrusions and teeth.  *Id.* at 28-30 (citing Dkt. No.

81-5, '417 Pros. Hx. at 417-046; '417 patent, col.3, ll.21-27 & Background).

The Court concludes that neither party has proffered a construction that comports with both the rules of claim construction and the language of the claims in the '417 patent.   "Anchoring means" uses the word "means," which alone is enough to trigger application of § 112, ¶ 6.  *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1303 (Fed. Cir. 2005) (citing *Rodine PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999)).  The claimed function is "to cause said at least one surface to tightly engage the interior surface of the vessel, duct or lumen to fixedly secure said device in place."  '417 patent, col.9, ll.43-45.  However, there is enough structure recited in Claim 1 to perform this function.  Specifically, Claim 1 delineates what the anchoring means is comprised of:  "plural projections . . ., each of said projections having a leading portion located in the upstream direction of the fluid flow and a trailing portion located in the downstream direction thereof, said trailing portion including at least one surface preferentially oriented to extend at an acute angle to the first direction . . . ."  The claim teaches that the preferential orientation of the trailing portion allows the fluid flow to force one surface of the trailing portion to tightly engage with the interior wall of the vessel.  *Id.* ll.40-45.  According to the plain meaning of the claim language, the plural projections, each of which has a leading portion and a trailing portion, with at least one of the surfaces of the trailing portion oriented at an acute angle to the direction of fluid flow, will perform the tightly engaging function.  This structure is sufficiently definite to distinguish it from the prior art referenced in the patent because none of those structures have the requisite trailing portion, with at least one portion thereof oriented at an acute angle to the direction of fluid flow.  Therefore, there

is no reason to resort to an analysis under § 112, ¶ 6; and no reason to limit the definition of the term "anchoring means" to the two embodiments in Figures 3 and 8 of the '417 patent.

Further, Claim 1 uses the term "comprising" to identify the structure of the anchoring means.  *Id.* ll.32-33 ("anchoring means . . . comprising plural projections"). "[T]he term 'comprising' is well understood to mean 'including but not limited to.'"  *Cias, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999)).  This open-ended language further supports the conclusion that the "anchoring means" described by the claims of the '417 patent need not be limited to arrow-like or wedge-shaped projections.  Rather, the claim language describes the structure necessary to perform the tightly engaging function – protuberances with a leading portion and a trailing portion such that one surface of the trailing portion is preferentially oriented at an acute angle to the direction of fluid flow.

In addition, the Court is struck by the similarity of the structure of an "anchor," as that word is used to describe the object that secures a boat in flowing water, and the structure of the "anchoring means" set forth in Claim 1.  Both parts have two portions, a "leading portion" and a "trailing portion," one of which is designed to be preferentially oriented to the fluid flow such that it engages with or becomes embedded in another surface to fix or hold secure the object to which the anchor is attached.  This comparison suggests that the anchoring means of the '417 patented inventions could be shaped like a boat anchor.  Such a shape comports with both the claim language and the specification, neither of which limit the "anchoring means" of the '417 patented

invention to arrow shaped or wedge shaped projections.

As suggested by this analogy, the Court cannot agree with Endotach that the "anchoring means" is merely a plurality of protuberances to aid in securing the device in place within the vessel, duct or lumen.  This definition is too broad and only repeats the desired function of the anchoring means without reciting the key components of the structure that performs the function.   There are multiple references in the patent specification that confirm the importance of the preferential orientation of the trailing portion, which must be part of the anchoring means.   In the description of the preferred embodiments, the patent teaches that the relevant section of the projections "include portions extending at an acute angle to the direction [in] which the fluid flows through the device" such that there are two forces at work on the projection:  one in the direction of fluid flow and one that "extend[s] radially, i.e. perpendicularly to the direction of the fluid flow."  '417 patent, col.7, ll.23-29.  It is "[t]his action [that] causes the projections to tightly engage . . . the interior of the vessel, duct, or lumen to fixedly secure the device in place." *Id.* ll.29-32.  The importance of the orientation of the projections to obtain the dual forces thereon is repeated, whether in discussions of the "arrow head" shape, the "wedge" shape, or alternatives contemplated, but not described.  *Id.* ll.35-45 (confirming that placement of the projections on the stents may be preferred or "exemplary," but not necessary, "so long as when the stent is expanded the projections **40** are properly preferentially oriented"); *id.* col.8, ll. 7-22 (discussing the arrow head shaped projections and confirming that the dual forces on the preferentially oriented projections "force the projections **40** into good engagement with the wall **12** of the vessel, duct, or lumen"); *id.* ll.61-67 (describing the preferentially oriented projections of the "wedge" shape); *id.*

col.9, ll.1-17 (stating that "anchoring projections can take numerous other shapes and sizes . . . so long as they are preferentially oriented").  Therefore, the broad construction proposed by Endotach is insufficient.

Accordingly, the Court construes the "anchoring means" to mean "multiple projections or protuberances with a leading portion and a trailing portion, such that one surface of the trailing portion is positioned at an acute angle relative to the direction of fluid flow."

The parties dispute the meaning of several terms used in Claim 1 to describe the structural elements of the "anchoring means" including "projections," "a leading portion," "a trailing portion" and "at least one surface."  Cook asserts that each of those terms are references to specific portions of either the arrow head shape or wedge shape preferred embodiments described in the patent and pictured in Figures 3 and 4.  *See* Dkt. No. 87, at 2-3.  Endotach proposes definitions for all but "at least one surface," which it argues does not need construction.  Because the Court has concluded that § 112, ¶ 6 does not apply to construction of "anchoring means," the Court rejects Cook's constructions for all these terms as too narrow.  However, the parties dispute the proper construction of the terms; therefore, the Court will address each in turn.

**Projections –** Endotach asserts that "projection" means "something that extends linearly outward from a surface."  The Court considers the claim language referencing the projections to establish that the inventor intended for the term to have its plain and ordinary meaning, almost to the point of not needing construction.  '417 patent, col.9, ll.33-42.  Claim 1 specifically describes the location and the structure of the projections – parts "located adjacent [to] said outer periphery of said tubular member," each of

which has "a leading portion . . . and a trailing portion."  *Id.* col.9, ll.32-38.

The specification leads to a similar conclusion using the terms "projection" and "protuberance" interchangeably to describe the preferentially oriented parts of the anchoring means and requiring that those parts extend outward from the surface of the graft sleeve.  *Id.* col.7, ll.12-16, ll.33-36; ll.39-42; ll.49-58; col.9, ll.1-13.  Further, the specification teaches that the projections may vary in height, or that extension of the projections may be selected or varied to suit the end use or to suit the end user.  *Id.* col.8, ll.27-38.  This is further evidence that Rhodes intended for the term to have its broadest possible construction.  To the extent it adds any clarity, the Court concludes that "projections" are "protuberances or parts that extend outward from a surface."[1]

**A Leading Portion & A Trailing Portion & At Least One Surface –** Endotach asserts that "a leading portion" means "a first portion of a projection;" similarly, Endotach asserts that "a trailing portion" means "a second portion of a projection." Endotach contends that the term "at least one surface" does not need further construction.

Claim 1 and the specification are clear that the leading portion and trailing portion refer to parts of the projections that comprise the anchoring means.  *Id.* col.9, ll.35-40. Further, the claim specifically requires that the "leading portion" be oriented in the upstream direction of the fluid flow.  *Id.* col.9, ll.35-36.  It also requires that the "trailing portion" be oriented in the downstream direction of the fluid flow and have at least one surface preferentially oriented at an acute angle to the fluid flow.  *Id.* col.9, ll.37-40.  *See*

_____

[1] Cook objects to the timing of Endotach's addition of the term "linearly" to its proposed definition of projections.  Endotach added the term in its claim construction response brief without further explanation.  The Court has construed the term projections to have its ordinary meaning, which renders Cook's objection MOOT.

*also id.* col.4, ll.10-14 (discussing, generically, the preferentially oriented portion of the projections of the patent device); col.8, ll.2-8 (discussing the trailing portion of the arrow head shaped preferred embodiment) & ll.61-67 (discussing the trailing portion of the wedge shaped preferred embodiment). In light of the specific requirements within the claim, the Court construes "a leading portion" to mean "part of a projection oriented in the upstream direction of the fluid flow;" and "a trailing portion" to mean "part of a projection oriented in the downstream direction of the fluid flow, with at least one portion positioned at an acute angle to the fluid flow."

In light of the Court's construction of the other terms pertaining to or included on the anchoring means, and to the extent the term "at least one surface" needs any construction, the Court concludes that "at least one surface" means "one portion, part or surface of the trailing portion of a projection oriented at an acute angle to the fluid flow." Claim 1 itself sets forth that one surface of the trailing portion of a projection is "preferentially oriented to extend at an acute angle" to the direction of fluid flow and the forces exerted on the projection force that surface to engage the interior of the vessel, duct or lumen. *Id.* col.9. ll.38-44. The requirements of this portion or part of the trailing portion is repeated in the specification. *Id.* col.4, ll.10-25 (describing, generically, the preferentially oriented portion of the projections); col.7, ll.23-32 (describing the portion of the projection extending at an acute angle to the direction of fluid flow); *id.* col.8, ll.7-9 (describing the portion of the arrow head shaped projection that is oriented at an acute angle to the fluid flow); *id.* ll.61-67 (describing portions of the wedge shaped projection that "are preferentially oriented at an acute angle to the direction of blood flow").

## C.     ENGAGEMENT WITH; ENGAGING; TO TIGHTLY ENGAGE

The parties dispute the meaning of the related terms "engagement with," "engaging" and "to tightly engage … to fixedly secure."   Endotach asserts that the first two terms have their ordinary meaning of to "come in contact with."  Dkt. No. 82, at 23. In addition, Endotach contends that the "tightly engaging" term must mean something different than "engagement with" or "engaging" because of the modifier "tightly," which would be read out of the claims if it were construed co-extensively with the other "engagement/engaging" terms.  *Id.* at 23-24.  Endotach argues that Rhodes acted as his own lexicographer when describing what "tightly engaged" means because he emphasized the importance of the height of the projections both to prevent the risk of perforating the tissue of the vessel, duct, or lumen; and to prevent migration of the device, which necessarily needs to be included in the definition of "tightly engage."  *Id.* at 24-25; Dkt. No. 85, at 15-16.   To that end, Endotach proffers the following construction for the "tightly engage" term: "to penetrate, burrow slightly into, or come in contact with the lumen wall to secure the device in place, the height being such that it minimizes penetration into the adventitial or medial layers of the lumen wall."

Cook argues that all three terms, "engagement with," "engaging" and "to tightly engage" mean "burrowing slightly into, but not perforating, the interior surface."  Cook contends that the intrinsic evidence only contemplates one definition based on the requirement that the anchoring means should "not pose a significant risk of perforating the tissue of the vessel, duct, or lumen."  Dkt. No. 92, at 31 (citing '417 patent, col.3, ll.53-57).  Further, Cook claims that Rhodes disclaimed any penetration of the vessel walls to overcome the patent examiner's prior art objection.  *Id.* at 31-32.  Specifically,

the original claim taught that the projections "tightly engage the interior wall of the vessel, duct, or lumen," *id.* at 31 (citing Dkt. No. 81-5, '417 Patent Prosecution History, at 417-027); but upon rejection based on prior art, Rhodes changed the claim to require less intrusive projections such that "at least one surface" tightly engages "the interior surface of the vessel, duct, or lumen …." *Id.* at 31-32 (citing Dkt. No. 81-5, '417 Patent Prosecution History, at 417-056 to -058).  Therefore, Cook states, the projections "no longer engage the 'interior' of the wall," rather, "a 'surface' on the trailing portion of the projections burrowed slightly into, but did not perforate, the interior surface of the wall." *Id.* at 32.  In other words, the surface interaction precludes perforation.  *Id.*

The Court concludes that the plain meaning applies to each of the terms using the root "engage," or "engaged" where "engage" means to partly embed, interlock or enmesh.  *See* Webster's, at 751 (defining "engage" as "to come into contact with or interlock with: MESH;" and "engaged" as "partly embedded").  Similarly, the term "tightly" has its ordinary meaning of "firmly."  *See id.* at 2392 (defining "tightly" as "fixed firmly or securely in place so as to be difficult to move").  Therefore, "engagement with" means "embedded, interlocked or enmeshed with;" "engaging" means "embedding, interlocking or enmeshing;" and "to tightly engage" means "to firmly embed, interlock or enmesh."

Starting with the language of the claims, the terms "engagement with" and "engaging" are used identically in Claims 1 and 10, respectively, to describe the extent of the contact between the anchoring means and the interior of the vessel, duct or lumen to ensure that the device is secure therein.  Claim 1 teaches that the projections that comprise the anchoring means are "arranged for engagement with the interior

surface of the vessel, duct, or lumen . . . to fixedly secure said device in place." '417 patent, col.9, ll.32-35.  Claim 10 teaches the identical concept, stating, "said anchoring means engaging the interior surface of the vessel, duct, or lumen . . . to secure said device in place."   Therefore, whether the term to be construed is "engagement" or "engaging," it means the same thing in the context of the '417 patent claims.

In addition, the use of the term "engaging" in Claim 10 requires something more than mere contact because the device becomes "secured" in place through the engagement of the projections with the interior surface of the relevant passageway. Contact alone is not enough to affix or secure a device in place, which is what is required by the claim.  Rather, an additional connection or action is necessary, which comports with the plain meaning of "engage:"  "to interlock" or "enmesh."

Further, if the terms "engagement with," "engaging" and "tightly engage" all mean the same thing, the word "tightly" becomes superfluous, which is improper when giving meaning to all the terms is possible.  *See, e.g.*, *Merck & Co. v. Teva Pharma. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (stating that "[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so" (citing *Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000); *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996)).  In Claim 1, "engagement with" is used in a more generic fashion to describe the placement of the anchoring means in relation to both the sleeve and the interior of the vessel, duct, or lumen.  '417 patent, col.9, ll.32-35.  The term "tightly engage" in Claim 1 describes the degree of connection between the projection and the interior surface of the vessel, duct or lumen, when the graft has fluid running through the inside.  *Id.* col.9, ll. 40-45.

These conclusions are supported by the specification.  In the Background of the Invention section, Rhodes references the small dome shaped projections identified in his '154 patent and describes them as effective aids in the securement of the graft, but goes on to state that "they never the less appear to be amenable to improvement insofar as graft retention is concerned."  *Id.* col.3, ll. 21-27.  Similarly, Rhodes mentions several prior art devices that include plural projections for securing a graft, but again he suggests that further improvements to ensure "good retention" are needed.  *Id.* ll.28-37. In other words, the patented invention does more than the prior art "small dome shaped projections," described as an "aid to securement," in the '417 patent, *id.* col.21-24; and "pressure points that help impact the graft into the atrial wall to maintain a fixed position therein," in the '154 patent, '154 patent, col.7, ll. 20-24.   Furthermore, Rhodes alternatively describes the anchoring means projections as "locking projections," *id.* col.8, ll.46-47 (describing the wedge shaped embodiment), which supports a plain meaning definition for the term "engage" (i.e. interlock) in any of its forms in the '417 patent.

The specification also teaches that, once the graft is in place, the preferential orientation of the projections use the forces there upon to "tightly engage" the interior wall of the vessel, duct, or lumen.  '417 patent, Abstract; *id.* col.4, ll.11-16 (describing that "the projections are arranged for engagement with the interior wall . . ., and are preferentially oriented to include portions extending at an acute angle to the first direction . . .;" and that those "portions tightly engage the interior of the wall of the vessel, duct, or lumen under the force applied to the tubular member by the fluid flowing through the passageway in the first direction); *id.* ll.16-25 (further describing the action

of the projections under the forces applied to the tubular member in the expanded state); *id.* ll.32-38 (stating that the "anchoring means engage[s] the interior of the vessel, duct, or lumen;" and "[t]he flow of fluid . . . through the graft sleeve and . . . the anchoring projections, to cause the anchoring projections to tightly engage, e.g. burrow slightly into, the interior of the vessel, duct, or lumen"); *id.* col.7, ll.17-32 (describing the preferred embodiment and the multiple forces applied on the projections when the fluid is moving through the graft such that it "causes the projections to tightly engage, e.g., burrow slightly into, the interior of the vessel, duct, or lumen to fixedly secure the device in place"); *id.* col.8, ll. 19-23 (describing how the fluid flowing through the device will force the projections into "good engagement" with the interior wall). These references to the multiple forces from the fluid flowing through the device that cause the graft to "tightly engage" the wall, leads the Court to conclude that the term has a meaning independent from the more generic "engagement with" and "engaging" terms in the patent.

The parties dispute, however, whether the patent allows for the projections to penetrate the interior surface of the relevant vessel, duct or lumen. As Cook points out, one of the express "Objects of the Invention" of the '417 patent is to provide an anchoring means that "does not pose a significant risk of perforating the tissue of the vessel, duct, or lumen." *Id.* col.3, ll. 53-57. As previously stated, Cook asserts that "one surface" of the protrusion burrows into, but cannot perforate or penetrate any part of the vessel, duct, or lumen, including the interior wall. Dkt. No. 92, at 31-32. Cook further argues that the substitution of references to the interior surface rather than the interior wall in the claims to avoid rejection over the prior art further supports the addition of a

non-penetrating limitation. *See id.* at 31-32; *see also* Dkt. No. 93, at 22. In other words, there is only some kind of surface interaction, there is no penetration. *See id.*

In contrast, Endotach asserts that the patent contemplates some degree of penetration to be "tightly engaged," but also teaches that "penetration may not be necessary for good resistance to migration of the device." '417 patent, col.8, ll.24-25. Endotach states that Rhodes acted as his own lexicographer to ensure that the risk avoidance feature of the invention was incorporated into the claims. Dkt. No. 85, at 15-16. This feature requires the user of the invention to determine the appropriate height of the protrusions for penetration of only the intima layer of the passageway wall. *Id.*

The Court cannot agree with either party because they both twist the plain meaning of the terms and the overall teachings in the patent. First, Cook's definition of "tightly engage," which uses the phrase "but not perforating" to mean "but not penetrating," would preclude protrusions that have a surface that burrows into, by slightly penetrating, the interior surface of the vessel, duct, or lumen. Such a definition takes the limitation "to tightly engage" the surfaces too far. The patent never contemplates that the protrusions perforate – creates a hole in - the walls of the vessels, ducts or lumens; it teaches just the opposite. As Cook itself acknowledges, an object of the invention is to provide an anchoring means that "does not pose a significant risk of perforating the tissue of the vessel, duct, or lumen." In the context of the remainder of the specification, it is clear that penetration of some kind, including burrowing or digging into, the interior surface is contemplated, but not perforating or creating holes through the wall. Therefore, Cook's secondary definition of "perforate" to mean "penetrate" is too limiting.

38

Specifically, the patent teaches that "to tightly engage," the projections must "burrow slightly into[] the interior wall of the vessel, duct, or lumen . . . ." '417 patent, col.4, ll.23-25.  *See also*, *id.* col.4, ll.37-38; col.7, ll.30-31; col.8, ll. 22-23.  The plain meaning of "burrow" is "dig," which necessarily requires penetration.  The patent even uses the terms "penetration" and "burrowing" as synonyms, stating "the more projections utilized the less 'penetration' or 'burrowing' will [be] necessary for good securement against migration."  *Id.* col.8, ll.43-45.  Further, given the multiple references to penetration of the projections, penetration points and/or penetration edges in the description of the preferred embodiment, *id.* col.8, ll.6-7; *id.* ll.22-23; *id.* 25-26; *id.* ll.64, it is clear that the definition for "tightly engage" must allow for some level of penetration.  The patent also makes clear that if penetration is desirable, it is only into the initial surface layer of the vessel, duct, or lumen; it does not penetrate, or perforate, the entire wall of the passageway.[2]  *Id.* col.8, ll.25-28.  It is this concept, the penetration of the initial surface layer, that the Court believes is conveyed by the additional references in the claims to the interior surface of the vessel, duct, or lumen: the penetration is limited to the interior surface layer of the passageway.

The proper construction of the "tightly engage" term must also be broad enough to include tight engagement that does not include penetration.  Rhodes indicates that

---

[2] Endotach's argument that Rhodes was his own lexicographer for the term "tightly engage" because of the description of the preferred projection height for the most desirable penetration in the specification is unsubstantiated by the specification.  As Cook points out, there is no reference in this section of the patent that links the height of the projections to the definition for "tightly engage."  See '417 patent, col.8, ll. 25-37.  Rather, as the Court has discussed, this section of the specification illuminates that "tightly engage" includes penetration of the interior surface layer of the relevant vessel, duct, or lumen, but not puncturing a hole into or tearing through the wall of such passageways.

"penetration may not be necessary for good resistance to migration of the device." *Id.* ll.24-25. The specification also states that "to tightly engage" need "not necessarily [include] penetration." *Id.* col.9, ll. 14-15. Alternatively, the patent states that the number of projections "will also be a considerable factor in the amount of securement against migration provided [by the anchoring means]. Therefore, as a general proposition, the more projections utilized the less 'penetration' or 'burrowing' will [be] necessary for good securement against migration." *Id.* col.8, ll.39-45. Therefore, the plain and ordinary meaning for "tightly," which is "firmly," in conjunction with the plain and ordinary meaning for "engage," which is "embed, interlock or enmesh," allows both for penetration of an interior surface layer and for contact that is not penetration, but firmly contacting.

For these reasons, the Court concludes that terms with the root "engage" mean "partly embedded, interlocked or enmeshed;" and "tightly" has its plain meaning of "firmly."

## D.    STENT

The last disputed term of the '417 patent is "stent," which is used in Claims 9 and 10. Nearly identical to their positions with respect to the similar term "stent means" in the '154 patent, Endotach asserts that the term has its broadest definition of "a supporting member;" Cook claims that the term is limited to "a ring-like member that is deformable, but not resilient." In effect, Cook argues that Rhodes limited the term "stent" when he incorporated by reference the '154 patent specification into the '417 patent. By doing so, Cook avers, Rhodes intended for the terms "stent means" and "stent" to be construed with the limitations found in the '154 patent. Dkt. No. 92, at 34-

35.

The Court agrees with Endotach that the '417 patent allows for the broadest construction of the term "stent."  The Court starts with the language of the claims.  Claim 9 states:  "The device in claim 1 wherein said tubular member is a stent."  '417 patent, col.10, ll.22-23.  This simple statement, broadly construed, suggests that the term "stent" should have its ordinary meaning to one skilled in the art at the time of the invention, which would be a hollow support.  *See* STEDMAN'S, at 1674.  Claim 10 merely adds that the "stent is expandable from a contracted state to an expanded state."  Thus, a simple definition of "hollow support" is also suggested by Claim 10.

Turning to the '417 patent specification, the breadth of the statements in the Objects of the Invention, coupled with the broadest description of the invention support a broad construction for the term "stent."  One of the objects of the invention is "to provide anchoring means for intraluminal medical devices, e.g., endovascular grafts, stents, etc., arranged to be fixedly secured within a vessel, duct, or lumen of a living being."  '417 patent, col.3, ll.45-48.  This purpose is written with the specific intention to improve prior art devices with only a new anchoring means.  Therefore, the broadest claims would refer to any prior art stent with this narrow improvement.  Similarly, the Summary of the Invention section generally describes the new medical device as a "tubular member and anchoring means."  *Id.* col.4, ll.1-2.  The use of the term "stent" in Claim 10, which substitutes a "stent" for the term "tubular member" in Claim 1, describes this very generic, but new device:  a stent with an anchoring means "arranged to be fixedly secured within a vessel, duct, or lumen of a living being."  *Id.* col.3, ll.45-48.

41

The Court agrees that Rhodes incorporated by reference his own prior art endovascular graft as set forth in the '154 patent, but there is no indication that he intended to limit the invention of the '417 patent to the preferred embodiment therein. Rather, Rhodes made clear that it is the preferred embodiment of the '417 patent that takes its cues from the '154 patent. In describing the advantages of endovascular grafting, the '417 patent states that very elastic fibrous tissues are "ideal for being supported by a stent (i.e., a self[-]supporting member)."[3] '417 patent, col.2, ll.11-14. The patent goes on to describe prior art and suggests that the '154 patent, incorporated by reference, overcomes many of the disadvantages of prior art endovascular grafts/stents. '417 patent, col.2, ll.15-67. Further, the Abstract references "ring-like stents," which mirrors the description later in the specification of the preferred embodiment. *Id.* Abstract; col.4, ll.28-29 (describing the preferred embodiment as an "endovascular graft, wherein the tubular member comprises a graft sleeve having plurality of ring-like stents disposed about the periphery thereof"). Similarly, the Detailed Description of the Preferred Embodiment specifically states that "[t]he graft device **20** is constructed in accordance with the teachings of my aforementioned patent, except for the means for fixedly holding it in place within the vessel, duct, or lumen." *Id.* col.5, ll.10-13.

Later in the description, Rhodes provides a more detailed explanation of the preferred embodiments of the projections, which comprise a portion of the anchoring means. *Id.* col.7, l.60 to col.8, l.67. There is nothing in those descriptions that require

---

[3] The language here further supports the Court's conclusion that the term "stent" was to have its ordinary meaning and broadly construed because Rhodes himself defined "stent" as a self-supporting member.

the referenced projections to be used exclusively on the endovascular device described by the '154 patent.  Similarly, the next paragraph teaches that these preferred shapes are not the only shapes contemplated and describes alternative embodiments that have the requisite preferential orientation of at least one surface of the projection.  *Id.* col.9, ll.1-17.  All of these descriptions suggest that the key to the invention is the anchoring means as part of the tubular member.  The Court will not import limitations from the preferred embodiment into the claims absent a clear intention to do so; nothing here amounts to a clear disavowal of claim scope.  *See, e.g.*, *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006) (declining to import limitations from the specification into the claims without evidence that the patentee "'intends for the claims and the embodiments in the specification to be coextensive'" (quoting *Phillips*, 415 F.3d at 1323)); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 905-09 (discussing multiple cases that require more than the description of a single embodiment to limit claim scope).

## V.  <u>CONCLUSION</u>

The Court construes the disputed terms of the Rhodes patents as follows:

| CLAIM CONSTRUCTION CHART FOR THE '154 PATENT | |
|---|---|
| **DISPUTED TERM** | **COURT'S CONSTRUCTION** |
| "stent means" | "a generally ring-like, hollow support that is resistant to contraction back to a compact state once it has been expanded" |
| "resistant to contraction back" | "able to withstand the force or effect of" |

| CLAIM CONSTRUCTION CHART FOR THE '417 PATENT ||
|---|---|
| **DISPUTED TERM** | **COURT'S CONSTRUCTION** |
| "tubular member" | "tubular member" |
| "anchoring means" | "multiple projections or protuberances with a leading portion and a trailing portion, such that one surface of the trailing portion is positioned at an acute angle relative to the direction of fluid flow" |
| "projections" | "protuberances or parts that extend outward from a surface" |
| "a leading portion" | "part of a projection oriented in the upstream direction of the fluid flow" |
| "a trailing portion" | "part of a projection oriented in the downstream direction of the fluid flow, with at least one portion positioned at an acute angle to the fluid flow" |
| "at least one surface" | "one portion, part or surface of the trailing portion of a projection oriented at an acute angle to the fluid flow" |
| "engagement with;" "engaging" | "to partly embed, interlock or enmesh" |
| "tightly" | "firmly" |
| "stent" | "a hollow support" |

IT IS SO ORDERED this 10th day of April, 2013.


_LARRY J. McKINNEY, JUDGE_
United States District Court
Southern District of Indiana


Distribution attached.

44

Distribution:

Steven G. Cracraft
BRANNON ROBINSON SOWERS HUGHEL & DOSS PC
scracraft@brannonrobinson.com

Angela K. Hsieh
BRINKS HOFER GILSON & LIONE
ahsieh@brinkshofer.com

Carolyn M. Brougham
BRINKS HOFER GILSON & LIONE
cbrougham@brinkshofer.com

Dominic P. Zanfardino
BRINKS HOFER GILSON & LIONE
dzanfardino@brinkshofer.com

Stephen C. Smith
BRINKS HOFER GILSON & LIONE
sxsmith@brinkshofer.com

Jeffry Michael Nichols
BRINKS HOFER GILSON & LIONE - CHICAGO IL
jnichols@brinkshofer.com

Brett Michael Pinkus
FRIEDMAN SUDER & COOKE - FORT WORTH TX
pinkus@fsclaw.com

Jonathan T Suder
FRIEDMAN SUDER & COOKE - FORT WORTH TX
jts@fsclaw.com

Glenn S. Orman
FRIEDMAN, SUDER & COOKE
orman@fsclaw.com